UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHAUMTOLI HUQ,

                                          Plaintiff,

                    -v-

THE CITY OF NEW YORK, New York City Police
Department ("NYPD") Officers RYAN LATHROP
(Shield No. 7736), First Name Unknown ("FNU")
BURTON, and JOHN DOEs 1 and 2 in their
individual capacities,

                                          Defendants.

---

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

14 CV 7081 (LTS)

CHAUMTOLI HUQ, by her attorney REBECCA HEINEGG, as and for her complaint,

does hereby state and allege:

### PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and
   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act
   of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff CHAUMTOLI HUQ's rights were violated when officers of the New York City
   Police Department ("NYPD") unconstitutionally and without any legal basis seized, detained,
   and arrested her, a few feet away from her husband and minor children. Plaintiff's rights were
   further violated when she was subjected to excessive force and excessively and unreasonably
   prolonged, unnecessary, and punitive detention.

3. Ms. HUQ's arrest is characteristic of a pattern and practice of the NYPD in aggressive
   overpolicing of people of color and persons lawfully exercising their First Amendment rights.

1

Ms. HUQ's arrest was based on perceptions of her race, gender, religion, and political affiliation, and not on any violation of law.

4. By reason of defendants' actions, Ms. HUQ was deprived of her constitutional rights.

5. Ms. HUQ seeks an award of compensatory and punitive damages and attorneys' fees.

6. Ms. HUQ also seeks injunctive relief in the form of a permanent injunction requiring the CITY OF NEW YORK to create and implement a training for NYPD officers to respect the constitutional rights of members of the Muslim community, with the Court to retain jurisdiction of this matter to ensure compliance by the defendants.

## JURISDICTION AND VENUE

7. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First, Fourth, and Fourteenth Amendments of the Constitution of the United States.

8. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

9. Venue is proper pursuant to 28 U.S.C. §1391(b) in that plaintiff's claims arose in the Southern District of New York.

10. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

11. Plaintiff CHAUMTOLI HUQ is a South-Asian female of Bangladeshi national origin, a Muslim, and a human rights attorney licensed to practice in New York. She is currently on leave from her appointment as General Counsel for the New York City Public Advocate's Office, and at all times relevant to this action was a resident of New York County, New York.

2

12. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers.

13. Defendants NYPD Officers RYAN LATHROP, First Name Unknown ("FNU") BURTON, and JOHN DOEs 1 and 2, ("individual defendants") were at all times relevant herein officers, employees and agents of the NYPD. At all times relevant to this action, the individual defendants were acting under color of state law as agents, servants, employees and officers of the NYPD. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD.

14. The individual defendants are being sued in their individual capacities.

15. Defendants' acts herein complained of were carried out intentionally, recklessly, and with malice and gross disregard for plaintiff's rights.

## STATEMENT OF FACTS

16. The incident alleged herein occurred at approximately 4:00 p.m. on July 19, 2014 in the vicinity of West 41st Street and 7th Avenue in New York County, and continued thereafter as set forth below.

17. At the time set forth in paragraph 16, Ms. HUQ and her family were leaving a lawful, peaceful protest in support of Palestinian human rights taking place in Times Square, New York County.

18. At the time and place set forth in paragraph 16, Ms. HUQ was waiting on the sidewalk in front of a restaurant for her husband to return from the restroom with their two young children. She was dressed in a traditional South Asian tunic.

19. Ms. HUQ was not blocking the sidewalk, was not impeding pedestrian traffic, and was not violating any law.

20. As Ms. HUQ waited for her husband and children, she was approached by the individual defendants, who, without any lawful purpose or basis, began to harass Ms. HUQ and tell her to move.

21. Ms. HUQ explained that she was just waiting for her husband and children, who were using the restroom inside the restaurant, and moved back against the wall, leaving the sidewalk completely clear for pedestrian traffic.

22. Defendant LATHROP, assisted by the other individual defendants then, without any legal basis, grabbed Ms. HUQ, turned her and pushed her against the wall, and placed her under arrest.

23. The individual defendants handcuffed plaintiff very tightly with plastic flex-cuffs, causing injury and pain to her wrists and hands.

24. One of the individual defendants twisted Ms. HUQ's arms upwards while they were handcuffed behind her back, causing Ms. HUQ severe pain and serious physical injury.

25. The individual defendants then took Ms. HUQ to the police precinct.

26. Defendant LATHROP demonstrated animosity towards Ms. HUQ, telling her, in sum and substance, "SHUT YOUR MOUTH," "YOU'RE MY PRISONER," and, upon learning that Ms. HUQ has a different surname than her husband, "IN AMERICA, WIVES TAKE THE NAMES OF THEIR HUSBANDS."

27. Because of her baseless arrest, Ms. HUQ was separated from her minor children and family, who were forced to go the police precinct to locate her.

28. Ms. HUQ was held in custody for approximately 9 hours before she was arraigned and charged.

29. Ms. HUQ was charged with violations of New York Penal Law § 195.05, Obstruction of Governmental Administration, New York Penal Law § 204.30, Resisting Arrest, and New York Penal Law § 240.20, Disorderly Conduct.

30. In a sworn information, Defendant LATHROP made the following factual allegations against Ms. HUQ:

> While attempting to maintain a crowd of approximately 1000 people located at the above location, I asked the defendant to continue walking down the sidewalk, to maintain her safety. The defendant refused to move as directed and stated in substance to me, "I'm not in anybody's way. Why do I have to move? What's the problem?" I repeatedly asked the defendant to move along the sidewalk and the defendant refused to do so.

> The aforementioned conduct of the defendant interfered with my ability to perform my official function as a police officer which at that time was maintained order and securing the safety of a crowd of persons engaged in a protest outside the above location.

> When I attempted to place the defendant under arrest for the aforementioned conduct, the defendant flailed her arms and twisted her body, making it difficult to handcuff her.

31. Defendant LATHROP made the sworn statement quoted above, on the basis of which Ms. HUQ was arrested and charged, with full knowledge that the statement was false.

32. On July 24, 2014, Ms. HUQ accepted an Adjournment in Contemplation of Dismissal.

33. As a result of this incident, Ms. HUQ suffered physical, psychological and emotional injuries, mental anguish, suffering, lost wages, humiliation and embarrassment.

**FIRST CAUSE OF ACTION**
**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION**
**THROUGH 42 U.S.C. § 1983**

34. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

35. Defendants NYPD Officers RYAN LATHROP, FNU BURTON, and JOHN DOEs 1 and 2, under color of state law, unlawfully seized and arrested plaintiff.

36. Defendants did not have probable cause to arrest plaintiff, nor was it objectively reasonable for defendants to believe that they did have probable cause to arrest plaintiff.

37. Defendant's decision to arrest plaintiff was not based upon plaintiff's violation of any provision of the penal law.

38. Defendants' decision to arrest plaintiff was based upon their perception of plaintiff's race, gender, ethnicity, and/or religious and political affiliation.

39. Defendant LATHROP, acting willfully and maliciously, commenced and continued a false prosecution against plaintiff, and caused her to be prosecuted.

40. Defendant did not have probable cause to commence and continue a criminal proceeding against plaintiff.

41. Plaintiff was unjustifiably deprived of her liberty for at least 9 hours as a result of the false arrest.

42. By the conduct described above, defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983, thereby depriving plaintiff of her rights, privileges and immunities, including, without limitation, deprivation of the following constitutional rights:

a.  Freedom to engage in protected speech, expression and association;

b.  Freedom from unreasonable seizures of her person, including but not limited to excessive pre-arraignment detention;

c.  Freedom from arrest without probable cause;

d.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

e.  Freedom from the lodging of false charges against her by police officers;

f.  The enjoyment of equal protection, privileges and immunities under the laws.

43.  As a result of defendant's deprivation of plaintiff's constitutional rights, plaintiff was deprived of her liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, mental anguish, lost wages, humiliation and embarrassment, costs and expenses, and was otherwise damaged and injured.

## SECOND CAUSE OF ACTION
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

44. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

45. All of the acts and omissions by the individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

46. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

7

47. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

48. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Racial and religious profiling, and particularly profiling of Muslims or of persons perceived to be of Muslim faith;

   b. Unlawful detention of civilians engaged in activity protected by the First Amendment;

   c. Arresting persons known to be innocent in order to meet "productivity goals" (*i.e.*, arrest quotas), particularly where such persons are engaged in activity protected by the First Amendment and/or the consent decree in *Black v. Codd*;

   d. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony,

      i. in order to protect themselves or other officers; and/or

      ii. in order to meet said productivity goals; and/or

      iii. in order to chill or obstruct persons from engaging in activity protected by the First Amendment;

   e. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   f. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

   g. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

49. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of racial profiling and profiling based on religious affiliation**, are evidenced, *inter alia*, by the following:

   a. In *Floyd v. City of New York*, 08 Civ. 1034 (SAS) (S.D.N.Y, Aug. 12, 2013) the Honorable Shira Scheindlin found, after a two-month bench trial, that the NYPD engages in a

widespread and systemic practice of racial profiling, and that senior NYPD officials are deliberately indifferent to these patterns and practices.

b. An extensive investigation by the Associated Press has revealed that since at least 2002, the New York City Police Department's Intelligence Division has engaged in the religious profiling and suspicionless surveillance of Muslims in New York City and beyond.[1]

50. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the use of excessive force, unlawful detention, interference with protected First Amendment activity, retaliatory use of force, abuse of process and deprivation of liberty without due process of law against individuals engaged in protected First Amendment activity**, may further be inferred from repeated occurrences of similar wrongful conduct, as documented by journalists, video, and in civil rights actions filed against the CITY:

a. *Berg v. Kelly*, 12-CV-3391, (TPG) (S.D.N.Y.) (NYPD officers detain approximately 100 "Occupy" demonstrators for two hours against their will on November 30, 2011 inside a pen built of interlocking metal barricades and then release them without charges);

b. *Garcia v. Bloomberg*, 11-CV-6957 (JSR) (S.D.N.Y.) (NYPD arrest 700 "Occupy" demonstrators on the Brooklyn Bridge on October 1, 2011, for the simple act of walking on the bridge in what appeared to participants to be an action sanctioned by police present at the time);

c. *Treffs v. City of New York*, 12-CV-3030 (HB) (S.D.N.Y.) (legal observer arrested while observing Occupy Wall Street march on January 1, 2012, without probable cause and false complaint sworn out against him);

d. On September 20, 2011, an NYPD officer punched an OWS protester in the head, grabbed him by the neck and pulled him to the ground, without evident provocation.[2] A journalist also reported the incident and provided a segment of the above video, stating that the video "shows an officer in a white shirt throwing a right-handed punch at a young man wearing a T-shirt and glasses."[3]

---

[1]*See, e.g.*, Matt Apuzzo & Adam Goldman, *Documents show NY police watched devout Muslims*, AP, Sept. 6, 2011; Matt Apuzzo & Adam Goldman, *Inside the spy unit that NYPD says doesn't exist*, AP, Aug. 31, 2011; Adam Goldman & Matt Apuzzo, *NYPD: Muslim spying led to no leads, terror cases*, AP, Aug. 21, 2012.

[2] LibertyPlazaRev, *09 21 2011 Police Forcefully Grab a Young Man! #occupywallstreet*, YOUTUBE (Sept. 21, 2011), http://www.youtube.com/watch?v=Pu8mlfBrpy8&feature=related%20%281:30%29 (punch and pull to ground at 1:24).

[3] Colin Moynihan, *For Commander Tied to Punching Incident, Evidence of a Blow Weeks Earlier*, N.Y. TIMES (Oct. 20, 2011, 12:53 PM), *available at* http://cityroom.blogs.nytimes.com/2011/10/20/for-commander-tied-to-punching-incident-evidence-of-a-blow-weeks-earlier/.

e. *Lambert v. City of New York*, 153046-2011 (Sup. Ct., N.Y. Co.) (officers use excessive force against OWS protestor by affixing plastic handcuffs so tightly that it caused nerve damage, despite her repeated requests to the officers that the cuffs be loosened but were not);

f. On September 24, 2011, a journalist stated he witnessed "about 20 or 30 police officers tackle people and prod them roughly with police batons."[4]

g. *Lotorto v. City of New York*, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

h. On October 14, 2011, Video shows that an NYPD officer sprayed multiple OWS protesters with pepper spray. The video appears to show that the officer sprayed continuously for approximately eight seconds, pointing the spray at any protester who came near.[5]

i. Also on October 14, 2011, a journalist reported that an NYPD officer "grabbed a protester wearing a green shirt. Then the [officer] punched the man, knocking him to the ground."[6]

j. *Taylor-Mickens v. City of New York,* 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issued four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

k. *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[7]

l. On November 15, 2011, a journalist reported an officer shoved a legal observer, also a retired judge, against a wall after she demanded the officer stop beating a protester.[8]

m. *Premo v. City of New York*, 13 CV 8141 (WHP) (S.D.N.Y.) (City agreed to pay $55,000 to settle case wherein plaintiff was arrested during a protest and charged with assaulting an

---

[4] John Farley, *Jailed for Covering the Wall Street Protests: Getting Arrested Alongside Citizen Journalists Gave Me a Taste of the Risks These Non-Professionals Take*, SALON.COM (Sept. 28, 2011), *available at* http://www.salon.com/2011/09/28/wall_street_protest_arrested/.
[5] SurvivalWithBushcraf, *Police Brutality – Wall Street Protesters Maced, Punched, Kicked, Clubbed Oct. 5 2011 8:45 PM*, YOUTUBE (Oct. 6, 2011), http://www.youtube.com/watch?v=DVH2iS38JS4 (pepper spray at 0:48).
[6] Colin Moynihan, *For Commander Tied to Punching Incident, Evidence of a Blow Weeks Earlier*, N.Y. TIMES (Oct. 20, 2011, 12:53 PM), *available at* http://cityroom.blogs.nytimes.com/2011/10/20/for-commander-tied-to-punching-incident-evidence-of-a-blow-weeks-earlier/.
[7] For a description of this case and settlement, *see* Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.
[8] *You Want to Get Arrested, Lady? The Retired Judge Shoved Up Against a Wall and Threatened by NYPD at Occupy Wall Street Clashes*, MAILONLINE.COM (Nov. 20, 2011,10:53 AM), *available at* http://www.dailymail.co.uk/news/article-2063716/Occupy-Wall-Street-Retired-JUDGE-shoved-wall-threatened-NYPD.html.

officer; protester was acquitted of all charges at trial after video evidence demonstrated that arresting officer had lied under oath).

n. *N.Y.C. Council Member Rodriguez v. Deputy Inspector Winski*, 2012 WL 1470305 (S.D.N.Y.) (12-CV-03389) (officers tackled City Council member Ydanis Rodriguez to the ground and struck him as he observed an Occupy Wall Street protest);

o. *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, *to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[9]

p. *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

q. *Kyne et al v. Wolfowitz et al*, 06-CV-02041 (S.D.N.Y.) (RJS) (protester arrested during the 2004 Republican National Convention; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

r. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

s. *Kunstler v. City of New York*, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiffs' political beliefs);

t. *Kaufman v. City of New York*, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

u. *Carin v. City of New York*, 95-CV-3472 (JFK), 1998 U.S. Dist. LEXIS 1533 (S.D.N.Y.) (bystander arrested while observing the arrest of a street vendor in a public place);

v. On June 10, 2014, the CITY paid $538,000 to settle a lawsuit alleging officers unlawfully arrested 14 protesters in 2012. The protesters were held for several hours and released without charges.[10]

---

[9] For a description of this case and the nearly $1 million settlement, *see* Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

51.  The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), is the report of a panel led by Hon. J. Milton Mollen of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins.

b.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[11]
>
> […]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[12]

c.  In June of 2011, in the case in New York County Supreme Court entitled *People v. William Eiseman* (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify

---

[10]Chester Jesus Soria, *City settles $583,000 suit with 14 Occupy Wall Street protestors*, Metro, June 10, 2014, *available at*  http://www.metro.us/newyork/news/local/2014/06/10/city-settles-583000-suit-14-occupy-wall-street-protestors/.
[11]Mollen Commission Report, p. 36.
[12]Mollen Commission Report, pp. 40-41.

paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[13]

d.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[14] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[15]

e.  *People v. Alicea*, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant indicted for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly shows that the two arrestees had no contact);

f.   *People v. Arbeedy*, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them

---

[13] Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at*  http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.
[14] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.
[15] *Id*.

anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

g. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[16]

h. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[17] The officers were indicted for felony perjury, filing a false report and filing a false instrument.[18]

i. In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[19] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[20]

j. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month

---

[16] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[17] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[18] John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[19] In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[20] *Id.*

investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[21]

k. *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal*/*Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

l. *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

m. *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

n. *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

o. *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

p. *Dotson v. City of New York*, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

q. *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

r. *Taylor v. City of New York*, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as *Richardson*, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified).

---

[21] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

52. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

a. In 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

b. The Mollen Commission report states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[22]

c. Upon information and belief, Defendant CITY did not take meaningful steps to eliminate the customs and practices exposed by the Mollen Commission Report.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[23]

e. *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

---

[22] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[23] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

f.  *White-Ruiz v. City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

g. *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

h. *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her);

i.  *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

j.  *Bryant v. City of New York*, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[24]

k. *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

l.   *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m. *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth); and

n.  *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion

---

[24] For a description of this case and ultimate settlement, *see* Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_ quotas_woman_injured_in_2006_arrest_settles_for_750.html.

and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers").

53.  The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Bratton.

54.  The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Bratton who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

55.  All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but not limited to, the constitutional rights enumerated in paragraphs above.

18

56.  Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of her rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

57.  Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

58.  Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Bratton, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

59.  The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of

plaintiff's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

60.  Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

61. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

## **JURY DEMAND**

62. Plaintiff demands a trial by jury in this action on each and every one of her damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.  That she be compensated for violations of her constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.  That she be awarded punitive damages against the individual defendants; and

c.  That the officers of the Patrol Borough Manhattan South Precinct undergo training on interacting with individuals who are or are perceived to be of Muslim faith; and

d.  That she be compensated for attorneys' fees and the costs and disbursements of this action; and

e.  For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         September 2, 2014

Respectfully submitted,

By:_____/s/_____
  Rebecca Heinegg, Esq.
  *Attorney for the Plaintiff*
  48 Wall Street, 11th Floor
  New York, New York 10005
  t: (212) 227-2303
  f: (212) 320-0230